Charles Estel Burke, Plaintiff-Appellant v. Civil Service Commission, State of Illinois, John J. McCarty, Henry Tenney and Lionel G. Thorsness, Commissioners of the Civil Service Commission, State of Illinois, Department of Public Safety, State of Illinois, and Joseph E. Ragen, Director of the Department of Public Safety, State of Illinois, Department of Personnel, State of Illinois, and Maude Myers, Director of the Department of Personnel, State of Illinois, Defendants-Appellees.

Gen. No. 10,466.

Third District.

June 4, 1963.

R. W. Deffenbaugh, of Springfield, for appellant.

William G. Clark, Attorney General, of Chicago (William C. Wines and Edward A. Berman, Assistant Attorneys General, of counsel), for appellees.

ROETH, JUSTICE.

This appeal is taken from a judgment of the Circuit Court of Sangamon County affirming the decision of the Civil Service Commission of the State of Illinois discharging plaintiff from his job as Prison Agricultural Foreman IV at the Illinois State Penitentiary, Pontiac branch, Pontiac, Illinois. The case was before the Circuit Court on administrative review.

Plaintiff was employed as farm manager at the Pontiac Penitentiary and certified under the Personnel Code. On February 28, 1961, the Director of the Department of Public Safety filed charges with the Department of Personnel. The charges were approved and plaintiff's discharge ordered on March 7, 1961. The charges were:

> "(1) Officer Burke refuses to comply with an Order issued by Officer Lexaus C. Jones to have a bar screen in a sewer cleaned out. As a result, water in the sewer backed up into the institution and an overflow passed into the sewer. A complaint was made by the Mayor of Pontiac to the Warden.
>
> (2) Failure to comply with an Order of Assistant Warden Haskel D. Alvey to remove rubbish and junk around Tower No. 5 and Tower No. 2.
>
> (3) Maintained one mare and a colt on the State property at State expense."

Plaintiff properly requested a hearing which was subsequently conducted and resulted in a favorable decision for plaintiff insofar as the first and third

447

charges were concerned. The Civil Service Commission, however, found that the plaintiff failed to comply with an order of the assistant warden of the prison, charge 2 above, and ordered his discharge and removal from his position.

The only question here for determination is the propriety of the ruling of the Circuit Court in affirming the discharge of plaintiff based upon charge 2.

■ While the question is not before the court we feel comment should be made on the fact that the record is completely devoid of any infractions of rules or orders with reference to the first and third charges. The very presence of these charges in this case casts a shadow of suspicion on the entire proceeding and warrants re-enunciation of the purpose of the Civil Service Act. In Hacker v. Myers, et al., 33 Ill App2d 322, 179 NE2d 404, the court said:

> "The purpose of the Civil Service Act is to insure a competent civil service for governmental bodies, and in furtherance of that end employees are assured of tenure in their positions provided they meet certain qualifications. They cannot legally be discharged for political or capricious reasons, but neither can they claim the right to be continued in their positions if they are incompetent."

The Personnel Code itself provides that no employee under the jurisdiction of the Code shall be removed or discharged "except for cause." It is the court's opinion, shared most certainly by the legislature, that no employee shall be discharged for capricious or political reasons.

With this in mind we now consider the evidence relating to the alleged disobedience on the part of the plaintiff. A total of five witnesses testified with relation to charge 2. Four were called by the defendants and plaintiff testified on his own behalf. The defend-

448

ants called Haskel Alvey, the assistant warden, Lexaus Jones, chief engineer, Daniel Clutts, a penitentiary employee who was under plaintiff's supervision, and Milford Schlosser, formerly a gardener under plaintiff's supervision and now acting superintendent, having taken over plaintiff's former position.

Alvey testified that two days after he took over as assistant warden he attended a staff meeting with the warden and among other people present were Jones and the plaintiff. This was on January 19, 1961, and the meeting can best be described as a policy meeting. He testified that at that time he told plaintiff, "the housekeeping conditions on the honor farm were very poor, and that the farm machinery was scattered all around and piled up near junk and trash located near Tower 2 outside the wall, scattered all over the grounds and there was garbage at the base of Tower 5, paper boxes and everything blown over the wall, and in this meeting I directed him to get this cleaned up." He testified that he noted the condition described remained the same when he rode around the honor farm with the warden the following evening and two or three days later he visited the farm, took plaintiff in his car and drove out to the area. On the ride he ordered the plaintiff to clean up the area. He testified that plaintiff agreed with him on the unsightliness of the area and plaintiff suggested a place on the farm away from the view of the public where the trash and junk could be placed.

Alvey further testified that the junk was not cleaned away until about the 1st of March when Schlosser cleaned it up. He also testified that he talked the matter over with plaintiff some time between the middle and last part of February. From the record it appears that this latter meeting took place after plaintiff had been asked to resign and had been relieved of his duties. Schlosser's testimony was that he took over as acting farm superintendent on Febru-

ary 9, 1961. Defendant introduced photographs of the area around Tower 2 into evidence, two of them taken the first part of February and two of them taken the first part of March.

Alvey's complaint regarded two parts of the prison grounds, one at a point that is referred to as Tower 2, and the other at a point referred to as Tower 5. The Tower 2 area had metal, wire, old refrigerators, tin cans, etc., in the vicinity of it. Apparently this was an accumulation of metal scrap. The area was outside the prison wall and apparently visible from the highway, which is some 700 to 800 yards away. The Tower 5 area had scrap paper boxes in the vicinity of it. Garbage barrels were placed at the base of Tower 5 and scrap paper boxes were placed in the barrels and paper and paper boxes blew out of these barrels and all down the area and were scattered all around the bottom of the tower.

Alvey testified that at the January 19 meeting he talked to the entire group and told them what he expected of them. He advised plaintiff that "I am going to insist on cleanliness."

The witness denied that plaintiff advised him that the metal junk outside Tower 2 had been sold to a Bloomington salvage company and denied that the plaintiff requested him to contact the salvage company to ascertain if they were coming for the rest of the metal. He admitted to having some discussion with plaintiff regarding the sale of junk to a Bloomington salvage company. At the time that the witness last discussed the matter with the plaintiff while plaintiff was still on duty there was snow on the ground but the ground was not frozen, nor was it muddy. The trash barrels at Tower 5 had no lids and the paper boxes could have been blown out or dropped when the trash was removed by employees not under plaintiff's supervision. Inmates from a dormitory near Tower 5 were assigned to clean up this area. No written

orders were ever given to the plaintiff regarding the trash in either area. The area around Tower 2 had been used for some period of time as an area in which to accumulate junk.

Lexaus Jones testified that he was present at the meeting on the 19th and heard Alvey direct a question to plaintiff asking if he was going to clean up the farm and he heard Alvey make reference to the "old junk pile." On cross-examination he testified that the junk pile had been there for the two years that Jones worked there and periodically removed and presumed that bids were taken on the junk.

Schlosser testified to his appointment as acting farm superintendent on the 9th of February, 1961, and that prior to that time he was gardener at the prison farm working under the plaintiff; that shortly after taking the position he was ordered to remove the junk pile at Tower 2 and started work on the same on the 10th of February, that it took approximately four days to clean the area. He testified with reference to Tower 5, "Quite a bit of paper and boxes had blown down on the wall. I had the men clean it up." With reference to Tower 2 he testified that there was quite a large pile of junk in the area prior to January 17 and that some of it was sold to a scrap iron company. Bids were taken on the junk and it was in fact purchased by the salvage company. For as long as the witness had been at the penitentiary the area had been used as a dumping ground for metal material from the prison. The witness testified that he devised a wire cage in the Tower 2 area to prevent the scattering of paper scrap and inmates from the dormitory were sent out every day to police the area. It is apparent from the testimony of the witness that metal scrap is now being accumulated at another portion of the grounds. It is evident that there is little that can be done except to accumulate it until such time as there is a sufficient quantity for resale.

451

The testimony of Daniel Clutts, the final witness of the defendants, was confined to the building of a small arms target out of dirt at a time when the ground was in a frozen condition and testimony regarding a quonset hut, a place used to store various machinery. Neither element is involved in the charge preferred, but each show plaintiff's compliance with other orders issued about the same time the orders we are here concerned with were issued.

Plaintiff testified that he attended the meeting on January 19 and that a part of the conversation was directed to him. It was the general statement of clean up and the assistant warden's insistence on sanitation. He stated he agreed and had always tried to keep the farm in order; that he was not given any directive as to Tower 2 or Tower 5 at the time. He described the meeting as a general staff meeting and a "general discussion and get together." During the meeting various remarks were directed to the various supervisors telling them what was expected of them. At a later time Alvey drove plaintiff to the Tower 2 area. The area is about an eighth of an acre and scrap metal had been deposited there for 5 years, the period of time that plaintiff had been employed at the prison. It had been used as a place to accumulate the scrap metal; that after sufficient quantities had been accumulated bids were taken from various salvage companies. He testified that a Bloomington salvage company had picked up 5 or 6 truckloads of scrap earlier in the winter and he related this information to Alvey. He requested Alvey to find out if the salvage company was coming for the remainder of the scrap and if they were not, he would remove the same. He testified that it was very cold at that time and snow was on the ground, the temperature approximately zero. The condition of snow is substantiated by the defendants' photographs. That they proceeded on to Tower

452

5 and found littered paper around the barrels. He stated that he had designated an officer in charge of the nearby dormitory to keep the area policed when needed. The litter was caused either by the wind blowing the paper from the barrels or through the neglect of inmates to pick up the paper when dumping the paper into a truck to remove it from the grounds. He denied that he was given an order with relation to the litter around Tower 5 and that he had advised Alvey that someone was in the area cleaning it up every day. The only order he received on that day was to build a back stop at Tower 4 for small arms shooting, which order he carried out. On cross-examination he admitted the discussion with Alvey relating to the debris around Towers 2 and 5 and the insistence upon strict sanitary conditions. Alvey stated the area was a mess and that he, plaintiff, agreed with him. That while he was on the job he recommended that the engineer build a wire grating in the Tower 5 area to help confine the litter but that nothing was done with reference to it; that he had previously ordered lids for the barrels in the Tower 5 area and that some were in fact made but they did not make enough to cover all the barrels.

He testified that on February 9 he was ordered verbally to get out and was relieved of his duties.

Plaintiff's job was that of overall supervisor of the farm. He was in charge of the farm and had approximately 600 head of hogs, 50 head of dairy cattle, a grain house, approximately 600 acres of land, 10 employees and 90 inmates working under him. He was in charge of all the grounds outside the wall. He had an officer working for him under his supervision to take care of the front lawn and maintain the sewer. He testified as to improvements made since he took over, including greater production.

From the foregoing it can be seen that the charge causing the removal of the plaintiff consisted of his purported refusal to obey an order to clean up two areas outside of the prison walls. The order was supposedly given on two occasions, the first at a general meeting of the staff and the second approximately three or four days later when plaintiff and Alvey drove around the area together. There is a conflict as to whether any precise order was given to plaintiff by Alvey or whether the information was transmitted to him in a general way. With respect to the accumulation of junk in the Tower 2 area, it is abundantly clear that the practice of accumulating this trash had been followed for many years prior to the complaint and that the trash was accumulated for the express purpose of storing with an eye toward ultimate sale; that at the time of the incident a salvage company had been in the process of removing the trash or at least so plaintiff believed. The witness Alvey testified that he again advised plaintiff that the trash must be removed but this was at a time when plaintiff had been removed from his position and, according to the testimony, at a time when the trash in the area had been already removed by Schlosser.

The court is hesitant to interfere with the orderly process in the employment and discharge of personnel. This hesitancy should not, however, be misconstrued. The rights of employees protected by the Personnel Code should be zealously guarded by the court. If the complaint is a genuine one there can be no reason for not proving the same at the hearing before the Civil Service Commission. It should be noted that there is no contention made that plaintiff was insubordinate, nor was there any proof, nor did the Commission find that he was in wilful violation of the order. In the analysis of the hearing officer he states,

454

"The respondent never did follow any of the orders," referring here to the second charge against plaintiff, and the ultimate decision of the hearing officer as affirmed by the Commission was that the respondent failed to comply with the order of the assistant warden.

In People ex rel. Carroll v. Durkin, 280 Ill App 510, at page 515, the court in commenting on the Civil Service Act as it then applied to cities and in defining the words "for cause," stated:

> ". . . The power to remove is not an arbitrary one, to be exercised at pleasure, but only upon just and reasonable grounds, and the record of the commission must show that it acted upon evidence, so that the court may determine whether there was any evidence fairly tending to sustain the charge." . . .

In People ex rel. Fosse v. Allman, 329 Ill App 296, 68 NE2d 203, the court said, quoting from Funkhouser v. Coffin, 301 Ill 257, 133 NE 649:

> ". . . the record must show that the board acted upon evidence and contain the testimony upon which the decision was based, in order that the court may determine whether there was any evidence fairly tending to sustain the order, . . ."

In Secaur v. Illinois State Civil Service Commission, 408 Ill 197, 96 NE2d 464, plaintiff was transferred from one department of the State to another. She was not assigned to a specific job and did nothing from the 1st of January, 1949, to the 18th day of March, 1949, the time of her discharge. The record discloses that her failure to work was without fault on her part and while she kept reporting for work she did not do so each day. There were circumstances present showing that her failure to report was due to the

actions of her immediate supervisors. The hearing officer found that she failed to report to work for a period covering February 25 to March 18, 1949, and relying upon that portion of the Act stating that an employee absent without leave for three successive days, etc., shall be considered to have resigned, found she was discharged for just cause. There the court said:

> "There is no dispute about the finding of facts, but rather the main question presented to this court by the record is whether such facts show a just cause for discharge. While courts of review which are considering the findings of facts made by an administrative body do not have the right to reweigh the evidence in the cause appealed from . . . still they do have the power and duty to consider the record to determine if the findings of the administrative agency are against, or supported by, the manifest weight of the evidence. . . . "

The court further said in discussing the decision of the Commission:

> "Regardless of the facts, to balance a civil service employee's right to employment on so tenuous an objection as the latter would be most arbitrary and unreasonable. . . . "

In Drezner v. Civil Service Commission, 398 Ill 219, 75 NE2d 303, the court had this to say:

> "We have also held that it is not within the province of the court to disturb the findings of fact made by an administrative agency unless manifestly against the weight of the evidence, but, on the other hand, if the finding of the administrative agency is against the weight of the evidence, it is the duty of the court to set aside the decision of the administrative agency. . . .

"While the Administrative Review Act does not purport to give a reviewing court the right to re-weigh the evidence in the cause appealed from, still the courts have the power, as indicated by the decisions herein cited under other administrative acts, to consider the record to determine if the findings of the administrative agency are borne out by the evidence in the cause and whether or not the findings are against the manifest weight of the evidence or if there is substantial evidence in the record to support the findings."

In Brown Shoe Co. v. Gordon, 405 Ill 384, 91 NE2d 381, the court said:

"We are aware of the rule, . . . that adminis-trative decisions must be upheld by the courts un-less manifestly against the weight of the evidence. This rule does not mean, however, that a stamp of approval must be placed on the decision of an administrative agency merely because such agency heard the witnesses and made the requisite find-ings. . . ."

Defendant argues that the determination of proper cause for discharge herein lies within the discretion of the Civil Service Commission, citing Joyce v. Board of Education of Chicago, 325 Ill App 543, 60 NE2d 431. It should be noted that in that decision the court reviewed the evidence and concluded the Board ac-tion proper. The court also said:

"In Murphy v. Houston, 250 Ill App 385, Mr. Jus-tice Matchett, speaking for the court, said that it was for the commission to determine what is cause for removal, but that it may not make an arbitrary and unreasonable rule in this respect, and then defined cause to mean 'some substantial

shortcoming which renders continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his not longer occupying the place.' "

In the most recently reported case before the Illinois courts, Gibbs v. Orlandi, 27 Ill2d 368, 189 NE2d 233, the Supreme Court said:

"On this appeal we readily agree with the defendants that neither this court nor the trial court is authorized to reweigh the evidence nor make an independent determination of the facts. . . . Nevertheless, an administrative decision must be supported by substantial evidence, and the courts have the right to review all questions of law and fact presented by the record. . . ."

■ Several matters appearing in the evidence should be noted. First, plaintiff's discharge was not predicated, and could not be, on the grounds that he was a sloppy housekeeper. The undisputed testimony is that he followed a practice of his predecessors in storing junk near Tower 2. Secondly, Alvey's reference to the orders as discussions or statements and the failure of the defendants to produce any witnesses to the January 19 meeting to substantiate the witness's statement that he in fact ordered the area involved cleaned up although the warden and others were present. Third, with reference to the scrap paper around Tower 5 the testimony of Schlosser and plaintiff that the area was not always messy and that occasionally the scrap paper would be blown about immediately after the area was policed by the inmates. Fourth, the rapid manner in which the discharge took place and the surrounding circumstances. Two days after his arrival, Alvey allegedly ordered the area

cleaned up. Three days later he again issued the same order. Then within twenty days from the first order plaintiff was relieved of his duties. In addition there is proof that other orders given about the same time were carried out by the plaintiff. Fifth, that plaintiff's job took in more than just "the housekeeping" of the grounds. The record disclosed he performed his duty as farm manager very well, and there is no showing he experienced trouble prior to the incident herein and there is not one scintilla of evidence showing he was in any way insubordinate. In fact, his testimony was merely that he did not understand that Alvey was ordering him to clean up the area around the two towers. He stated he understood Alvey was to contact the salvage company to see if they were coming for the rest of the scrap and if not Alvey was to advise him and he would then remove the scrap. The condition of the grounds in the area of Tower 5 was not in and of itself of major proportion, but of equal importance is the fact that the record fails to show anything imperative regarding the task he was ordered to perform.

The sum and substance of the complaints, therefore, show plaintiff failed to abide by two alleged orders, neither of which he understood as orders. We feel as the court did in Secaur v. Illinois Civil Service Commission, supra, to balance a Civil Service employee's right to employment on so tenuous an objection as this would be most arbitrary and unreasonable.

The court is also of the opinion that the decision of the Civil Service Commission was against the manifest weight of the evidence in that the same failed to establish "cause" for the dismissal. Plaintiff's acts did not constitute some substantial shortcoming which renders continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and

sound public opinion recognizes as a good cause for his no longer occupying the position. Murphy v. Houston, supra. In fact, the contrary would seem to be true.

We therefore find that the trial court erred in sustaining the decision of the Commission. The judgment of the trial court of Sangamon County and the decision of the Civil Service Commission of the State of Illinois is reversed and plaintiff is ordered to be reinstated to the position which he held at the time of his discharge.

Reversed.

REYNOLDS, PJ and CARROLL, J, concur.